IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | | |
|---|---|---|
| NATIONAL CASUALTY COMPANY, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. AW-05-1992 |
| LOCKHEED MARTIN CORPORATION, | * | |
| Defendant. | * | |

## MEMORANDUM OPINION

Plaintiff brought this action against Defendant for Declaratory Judgment regarding the parties' rights and obligations under a marine package policy ("the Policy"). Defendant filed a counter-claim against Plaintiff for compensatory damages, interest, and reasonable attorney's fees. Currently pending before the Court are Plaintiff's Motion for Partial Summary Judgment; Defendant's Cross Motion for Summary Judgment; and Defendant's Motion for Leave to File Excess Pages Relating to Reply Memorandum. The Court has reviewed the record and the parties' filings with respect to the instant motion. The issues have been fully briefed, and no hearing is deemed necessary.[1] *See* Local Rule 105.6 (D. Md. 2008). For the reasons stated below, the Court will: (1) GRANT IN PART and DENY IN PART Plaintiff's Motion for Partial Summary Judgment; (2) GRANT IN PART and DENY IN PART Defendant's Cross Motion for Summary Judgment; and (3) GRANT Defendant's Motion for Leave to File Excess Pages Relating to Reply Memorandum.

---

[1] As the Court has determined that no hearing is necessary, the Court denies Defendant's Request for a Hearing.

**I.     BRIEF FACTS**

Defendant Lockheed Martin Corporation ("Lockheed") owns the Motor Vessel Sea Slice ("the vessel" or "the Slice"), which was built in 1996.[2] The Plaintiff, National Casualty Company ("National Casualty") is the insurer of the Slice.

On July 30, 2001, the Slice set out from Honolulu, Hawaii to Anchorage, Alaska, for the purpose of participating in a series of demonstrations for the United States Navy. Prior to departing from Honolulu, the vessel underwent a series of repairs, tests, and sea trials to ensure its seaworthiness. Lockheed received several recommendations for repair and refitting of the vessel. One of these recommendations was that Lockheed fit the vessel with additional fuel reserves.[3] Lockheed calculated that, as a result of the extra fuel, the Slice would leave port at a draft depth of 15.7 feet.[4] While the parties do not agree, it seems that the optimum draft depth for the Slice on this journey was 15.5 feet. *See* (Docket No. 90, at 13.) As a result of its calculation, Lockheed determined that the vessel would not require any extra ballast before it set out. With estimates ranging from 15.7 feet to 17.5 feet, the actual draft depth of the Slice on July 30, 2001 is still in dispute.[5] Lockheed contends, although National Casualty denies it, that a

---

[2] The Slice fits in a category of ships collectively known as "Small Waterplane Area Twin Hull" ("SWATH") vessels. SWATH vessels differ from mono-hull designed ships in that they ride on two submerged pods connected to a superstructure by reinforced struts. Differing even from the typical SWATH design, the Slice rides on four submerged pods. The goal of this adaptation is increased stability and maneuverability.

[3] National Casualty disputes that Ward Graessle was responsible for this recommendation. Instead, they claim that the Office of Naval Research required Lockheed to add the additional fuel. *See* (Docket No. 97 at 34.)

[4] Draft depth is a measurement of the distance between the bottom of the ship and the water-line. Draft depth is calculated by taking the average of this measurement at the bow and stern of the ship. This calculation is important in determining the depth of water needed to safely maneuver the vessel as well as the amount of stress placed its hull.

[5] Predictably, National Casualty estimates that, before setting forth, the Slice was at a draft depth of 17.5 feet. This estimate is based on pictures taken by Lockheed employees while the Slice was at the dock. *See e.g.* (Docket No. 97 at 34.)

crew-member, unbeknownst to the captain of the Slice or the engineers on hand, ballasted the ship just before departure, further increasing the Slice's draft depth.

Within 24 hours of leaving port in Honolulu, the Slice began to have serious problems. The captain chose to take the vessel through the Molokai channel. Shortly after departure, the vessel suffered fuel contamination when sea water flowed into a fuel tank through an improperly sealed fuel line cap.[6] On July 31, the Slice suffered further structural and mechanical failures as a result of sea water flooding the engine room. The source of this flooding was damage to the hull caused by the heavy sea conditions and the excessive draft depth of the vessel. Although the Slice almost sank, its crew was able to keep it afloat, and a tow vessel pulled it back to Honolulu on August 1, 2001. Thereafter, the vessel suffered two more accidents: an allision with another docked vessel on August 4, 2001 and a collision with the vessel's tug on August 15, 2001.[7]

After the Slice returned to Honolulu, Lockheed's marine surveyor, Michael Doyle, and National Casualty's marine surveyor, Ward Graessle, produced a list of necessary repairs. Lockheed contacted repair yards, and found that only two repair yards in Hawaii had both the capacity to repair and the interest in repairing the Slice. Of these two repair yards, only one, Navatek, offered to take on the project.[8] Navatek submitted a fixed price bid, which did not include the price of materials, electronic and engine components, repairs and subcontract work, of $1,440,968.65. After Navatek completed repair of the Slice, Lockheed submitted an interim

---

[6] The parties differ on the occurrence which gave rise to this damage. Lockheed asserts that, because the cause of the faulty fuel line cap was the heavy seas in the Molokai channel and the water that came aboard the ship because of the increased draft depth, the damage caused by this faulty cap can be attributed to a single occurrence, thus requiring only one deducible fee. National Casualty asserts that the fuel contamination and the engine-room flooding were two separate occurrences, thus requiring two deductible fees.

[7] Lockheed settled its claims related to the allision and collision with the owner and insurer, which also happened to be National Casualty, for those vessels.

[8] Navatek performed a great deal of the maintenance on the Slice prior to its departure, and the vessel was towed there from the Molokai channel on August 1, 2001.

insurance claim of $2,714,181.46 to National Casualty. This claim included not only the cost of Navatek's repairs, but also of Detroit Diesel's engine repairs, electrical subcontract work, drydock, surveyor services and painting invoices, and Lockheed's expenses for investigation and its legal fees.[9]

National Casualty disagreed with Lockheed's calculation in many respects. Primarily, National Casualty rejected the assertion that the Policy covered Lockheed's legal fees and administrative costs. Aside from this rejection, National Casualty also contested Lockheed's allegation of a single occurrence. National Casualty concluded that two separate occurrences had taken place – the fuel cap failure and the engine room flooding – and, thus, that Lockheed was subject to two separate deductible fees of $100,000 each. Finally, National Casualty asserted that the cost of Navatek's repairs was unreasonable. On July 21, 2003, National Casualty sent Lockheed a check for $666,318 which represented its determination of the cost of reasonable repairs less the $100,000 deductible per occurrence. Lockheed rejected National Casualty's attempted payment, and did not deposit the check.[10]

The policy under which National Casualty insures the Slice was written in the early 1980s by Lockheed's broker's, Aon, predecessor in conjunction with Mutual Marine, then underwriter of the policy. In 1996, Aon approached International Specialty Inc. ("ISI") to become the underwriter of the Policy.[11] ISI agreed, and was the insurance underwriter of the Slice from the moment it launched in 1997 to the time of the incident giving rise to this

---

[9] National Casualty included a description of the administrative cost categories in its Motion for Partial Summary Judgment. *See* (Docket 83, at 6.)

[10] National Casualty claims that Lockheed retained its proffered payment for two years, but Lockheed claims that it rejected the payment immediately.

[11] The parties differ with respect to the roles that Aon and ISI played in creating, modifying, and approving the Policy.

litigation. In 2001, ISI became National Casualty's agent. Effective from March 15, 2001 to March 15, 2002, the Policy, described as a "manuscript policy,"[12] was divided into three sections: Section I, Hull and Machinery; Section II, Protection and Indemnity; and Section III, Marine Liabilities. The Hull and Machinery Section is applicable to this case. Following these three sections is a section entitled "General Conditions." The Policy prefaces this section with the phrase "(*AS RESPECTS ALL SECTIONS*)".

The parties dispute the interpretation of two of the General Conditions: 2(a) and 17.[13] General Condition 2 states:

> [T]his policy also covers – (a) Costs, charges and expenses reasonably incurred by the Assured in defense and/or investigation of any claim coming within the scope of this policy, subject to the agreed deductibles applicable, and subject to the conditions and limitation hereinafter provided.

(Docket No. 1, Ex. B, at 3.) General Condition 17, titled "Survey Fees, Etc." states:

> Notwithstanding anything to the contrary contained herein, all fees and expenses for survey, investigation, claims handling or adjusting, and legal expenses shall be payable in full by Underwriters without deduction.

(Docket No. 1, Ex. B, at 17.)

On July 22, 2005, National Casualty filed the Complaint (Docket No. 1) against Lockheed seeking declaratory judgment, and amended that Complaint on September 23, 2005 (Docket No. 3). Lockheed filed an answer and counter-claim for damages, interest, and attorney's fees on October 17, 2005. On February 10, 2009, National Casualty filed the instant Motion for Partial Summary Judgment seeking a finding that legal fees and administrative costs are not within the scope of the Policy under General Conditions 2 and 17. On March 13, 2009, Lockheed filed a Cross Motion for Summary Judgment seeking denial of National Casualty's

---

[12] This is to say that it was not a "form policy," but was written specifically for this insurance agreement.

[13] Of particular importance in this dispute is how these general provisions apply within the scope of each of the Hull and Machinery, Protection and Indemnity, and Marine Liabilities sections.

Motion, and a finding that General Conditions 2 and 17 of the Policy covers Lockheed's legal fees and administrative costs.  Lockheed also seeks Partial Summary Judgment that: (1) dismisses National Casualty's affirmative defense that Lockheed had failed to exercise due diligence; (2) finds that the fuel cap failure and the engine room flooding are one occurrence under the Policy and thus subject to one deductible; (3) finds that National Casualty is bound by the agreement of its surveyor as to the repairs that were owner's work and those that related to tug damage; and (4) finds that the minimum recovery to which Lockheed is entitled is $718,945.

## II.   STANDARD OF REVIEW

Summary judgment is only appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).  The Court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  When parties file cross motions for summary judgment, the Court must view each motion in a light most favorable to the non-movant. *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).  To defeat a motion for summary judgment, the nonmoving party must come forward with affidavits or other similar evidence to show that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  While the evidence of the nonmoving party is to be believed and all justifiable inferences drawn in his or her favor, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences. *See Deans v. CSX Transp., Inc.,* 152 F.3d 326, 330-31 (4th Cir. 1998).  Additionally, hearsay

statements or conclusory statements with no evidentiary basis cannot support or defeat a motion for summary judgment. *See Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995).

## III.     DISCUSSION

### A.     Contract Provisions

To resolve this conflict, the Court must begin by looking to Maryland law. Under Maryland law, insurance policies are interpreted in the same manner as contracts generally; and Maryland law does not adhere to the rule that an insurance policy should be construed most strongly against the insurer. *See Collier v. MD-Individual Practice Ass'n,* 607 A.2d 537, 539 (Md. 1992). As with all other contracts, a court must attempt to ascertain and give effect to the intentions of the parties at the time of contracting. *See Levy v. American Mut. Liab. Ins. Co.*, 73 A.2d 892, 894 (Md. 1995). To determine the parties' intent, the court must view the instrument as a whole, attributing to each word its normal or customary meaning, unless some indication exists that the parties intended to use words in a special technical sense. *See Kendall v. Nationwide Ins. Co.*, 702 A.2d 767, 771 (Md. 1996); *Sullins v. Allstate Ins. Co.,* 667 A.2d 617, 619 (Md. 1995); *Nolt v. United States Fidelity & Guar. Co.,* 617 A.2d 578, 584 (Md. 1993); *Collier,* 607 A.2d at 539. While the character of the contract, its object and purposes, and the factual circumstances of the parties at the time of execution may assist in interpreting the meaning of a particular contractual provision, clear and unambiguous language must be enforced as written. *See Dutta v. State Farm Ins. Co.*, 769 A.2d 948, 957 (Md. 2001); *Board of Trustees of State Colleges v. Sherman*, 373 A.2d 626, 629 (1977) ("where a contract is plain and unambiguous, there is no room for construction").

1. General Condition 2

General Condition 2 states:

> [T]his policy also covers – (a) Costs, charges and expenses reasonably incurred by the Assured in defense and/or investigation of any claim coming within the scope of this policy, subject to the agreed deductibles applicable, and subject to the conditions and limitation hereinafter provided.

(Docket No. 1, Ex. B, at 3.)

National Casualty argues that this clause only applies to charges and expenses incurred by Lockheed in investigating and defending third-party claims brought against Lockheed. Lockheed argues that this clause applies to "any claim coming within the scope of this policy," which includes Lockheed's claim against National Casualty under the Hull and Machinery Section of the Policy. The parties assert numerous arguments to support their positions. In particular, National Casualty relies heavily on the fact that many form maritime insurance policies include similar clauses and those clauses are typically limited to expenses and costs associated with third-party claims. Lockheed replies that this is a manuscript policy that was specifically drafted to be different than a form policy and, thus, the clauses in other form policies are irrelevant.

The Court has considered the parties arguments, the relevant case law, and General Condition 2. Having done so, the Court finds that General Condition 2 is unambiguous. The text of this clause is clear: it applies to "any claims coming within the scope of this policy." Lockheed's claim against National Casualty is a claim "within the scope of this policy." As such, the Court finds that General Condition 2 is applicable and allows Lockheed to recover "charges and expenses reasonably incurred by [Lockheed] in defense and/or investigation" of its claim against National Casualty. Had the parties intended the clause to mean anything different, the parties could have negotiated General Condition 2 to specify that it only applies to third-party

8

claims, as many form policies have done. The parties did not limit General Condition 2 in such a manner, and the Court does not believe it appropriate to read such a restriction into the clause.

In reaching this decision, the Court finds only that General Condition 2 applies to Lockheed's claim against National Casualty. The Court believes it is appropriate for the jury to determine what "charges and expenses" were "reasonably incurred by [Lockheed] in defense and/or investigation" of this claim.

2. General Condition 17

General Condition 17 states:

> Notwithstanding anything to the contrary contained herein, all fees and expenses for survey, investigation, claims handling or adjusting, and legal expenses shall be payable in full by Underwriters without deduction.

(Docket No. 1, Ex. B, at 17.)

National Casualty argues that this clause is not a grant of coverage and is limited to fees and expenses incurred by National Casualty. In other words, National Casualty maintains that this clause means only that if National Casualty incurs any fees or expenses while surveying, investigating, claims handling, or adjusting a claim made by Lockheed, National Casualty will pay for those expenses without deducting any such payment from Lockheed's policy limit. Lockheed argues that General Condition 17 provides coverage for all of its legal expenses and for all of its fees and expenses for survey, investigation, claims handling, and adjusting. National Casualty responds that Lockheed's interpretation would lead to the absurd result of National Casualty being liable for Lockheed's legal expenses regardless of whether Lockheed has a valid claim or not. National Casualty also asserts that this clause describes expenses that an insurer incurs. National Casualty further points out that the "without deduction" language supports its argument.

The Court has considered the parties arguments, the relevant case law, and General Condition 17. The Court believes that General Condition 17 is ambiguous. Contrary to Lockheed's assertion, it is appropriate for the Court to construe the meaning of this ambiguous clause, as there is no factual dispute in the evidence regarding this clause. *See Pacific Indem. Co. v. Interstate Fire & Cas. Co.*, 488 A.2d 486, 489 (Md. 1985) ("The court may construe an ambiguous contract if there is no factual dispute in the evidence.").

For at least four reasons, the Court finds that General Condition 17 applies only to fees, expenses, and legal expenses incurred by National Casualty. First, the Court notes that the "without deduction" language would be meaningless and nonsensical if Lockheed's interpretation were correct. Under Lockheed's interpretation of the policy, National Casualty should pay Lockheed's legal expenses and other expenses without deducting those payments from the policy limit. This reading clearly cannot be the intent of the parties and would essentially eviscerate the policy limit.

Second, many of the activities listed in this clause are terms associated with activities of an insurer. In particular, the Court understands "claims handling or adjusting" to be activities undertaken by an insurer, not an insured. Under the principle of *noscitur a sociis*, a "word is given more precise content by the neighboring words with which it is associated." *See United States v. Williams*, 128 S. Ct. 1830, 1839 (2008). As the neighboring words, "claims handling" and "adjusting," refer to activities engaged in by an insurer, the Court believes that the word "legal expenses" in this clause refers to legal expenses incurred by National Casualty.

Third, Lockheed's reading of this clause is absurd. *See Catalina Enters., Inc. Pension Trust v. Hartford Fire Ins. Co.*, 67 F.3d 63, 66 (4th Cir. 1995) ( "It is axiomatic under Maryland law that a court should avoid reading a contract in a way that produces an absurd result,

especially when a reasonable interpretation is available."). Under Lockheed's reading of this clause, National Casualty is liable for all of Lockheed's legal expenses. General Condition 17 states that "all . . . legal expenses shall be payable in full by Underwriter." The text of this clause does not limit how those legal expenses are incurred. In other words, Lockheed's interpretation of this clause would mean that National Casualty would be liable for Lockheed's legal expenses regardless of whether Lockheed won or lost the case. Moreover, taken to the extreme, Lockheed's interpretation of this clause could mean that National Casualty is liable for all of Lockheed's legal expenses regardless of whether those legal expenses even relate to the Slice, as the clause does not textually limit itself to legal expenses related to claims arising under the Policy. This clearly could not have been the intent of the parties.

Fourth, this policy was drafted by Lockheed's insurer broker. As such, the Court believes that it is appropriate to construe any ambiguous language against Lockheed.

Accordingly, the Court finds that General Clause 17 only applies to fees, expenses, and legal expenses incurred by National Casualty.

**B.     Due Diligence**

In its Answer to Lockheed's counter-claim (Docket No. 8.), National Casualty asserted the affirmative defense that Lockheed failed to exercise due diligence when it sent the Slice on the June 30, 2001 voyage. Lockheed moved to dismiss this affirmative defense in its Response and Cross Motion for Summary Judgment. (Docket No. 90.)

Although it has not been extensively considered in this Circuit, the burden of proving a failure to exercise due diligence with respect to a marine insurance policy appears to be on the insurance company. The Fifth Circuit considered this issue in *Saskatchewan Government Insurance Office v. Spot Pack, Inc.*, 242 F.2d 385 (5th Cir. 1957). In *Saskatchewan*, the Fifth

Circuit highlighted the American Rule which "is not that the vessel shall continue absolutely to be kept in a seaworthy condition, or even that she be so at the inception of each voyage, or before departure from each port during the policy term.  It is, rather, stated in the negative that the Owner, from bad faith or neglect, will not knowingly permit the vessel to break ground in an unseaworthy condition."  *Id* at 388.  A key element of the affirmative defense of failure to exercise due diligence is knowledge of unseaworthy condition.  *Saskatchewan* goes further to show that the insurer bears the burden of demonstrating this knowledge.  *See id.* at 389.

The Policy at issue in this case contains, in its Liner Negligence Clause, a provision concerning the owner's due diligence.  This provision reads:

> This Section also specially to cover, subject to its terms and conditions: (A) Breakdown of motor generators [etc.] (B) Loss of or damage to the subject matter insured directly caused by: (1) Accidents on shipboard or elsewhere, other than breakdown of or accidents to nuclear installations or reactors on board the insured Vessel; (2) Negligence, error of judgment or incompetence of any person:. . . . Provided such loss or damage (either as described in A or B or both) has not resulted from want of due diligence by the Assured(s), the Owner(s) or Manger(s) of the Vessel, or any of them.  Master, mates, engineers, pilots or crew not to be considered as part owners within the meaning of this clause should they hold shares in the Vessel. (Docket No. 1, Ex. B, at 13-14.)

On July 21, 2003, National Casualty's counsel mailed a letter to Lockheed's counsel.  (Ex. 9 to Defs. Mot. Summ. J.)  In that letter, National Casualty's counsel wrote:

> From our investigation, Lockheed Martin appears to have exercised the requisite due diligence to avoid this flooding loss, including by carrying out repairs of the prior hull cracking, although as mentioned above until quite recently we had not been able to interview one of the principle engineers involved in the vessel's structural loading analysis, Mr. Wilkie. . . . Unless contrary information is later obtained or provided, the due diligence proviso to coverage appears to be met.

Citing *United States v. Gregory*, 871 F.2d 1239, 1242 (4th Cir. 1989), Lockheed argues that this admission is binding on National Casualty.  Lockheed also asserts that admissions that are legal conclusions, particularly conclusions that waive legal defenses, are binding even when

made prior to litigation.  Lockheed cites *Meyer v. Berkshire Life Ins. Co.*, 372 F.3d 261, 265 (4tht Cir. 2004) ("When a party unqualifiedly waives a legal defense, it is within the court's discretion to construe that waiver as judicial admission in a manner that effectuates the strategic purpose for which the court reasonably believes the waiver was made."); *Alpine Forrest Partners v. Crown Central Petroleum Corp.*, No. 95-1871, 1998 WL 45449, at 4 (4th Cir. Apr. 4, 1996) (finding a letter from counsel, written long before the litigation commenced, to contain a binding judicial admission where the letter stated a legal conclusion and facts that supported that conclusion).  Lockheed also argues that even if the admission is not binding, National Casualty has the burden of showing a failure to conduct due diligence and National Casualty has not presented evidence to meet that burden.

National Casualty asserts that the letter from its counsel did not waive the defense of due diligence because the letter was conditional on contrary information not being obtained.  National Casualty maintains that it obtained new information after drafting the letter.  Specifically, National Casualty argues that it obtained deposition testimony from Mr. Wilkie, who testified that he was worried about whether the ship could withstand the voyage, that he expressed his opinion to management that the voyage should not occur, and that his opinion was overrode by management.  National Casualty also argues that Lockheed did not engage in due diligence because Lockheed did not check the vessel's draft or check the weather forecast.

Lockheed responds that National Casualty had all relevant information at the time of the letter and obtained nothing new after writing it.  Lockheed also argues that it did check the vessel's draft after fuel had been loaded and prior to departure, and that it obtained a weather forecast prior to departure.

The Court has reviewed the record, arguments, and relevant case law. Having done so, the Court does not believe that National Casualty should be allowed to maintain the defense of due diligence. At the time of drafting the July 2003 letter, National Casualty was aware of all relevant information, and no new information was obtained after that date. As such, the Court finds that the July 2003 letter contained a binding admission regarding Lockheed's due diligence. The Court notes that the July 2003 letter refers to the facts surrounding the incident and supporting National Casualty's determination that due diligence was conducted. Moreover, the Court notes that National Casualty relied on that opinion and mailed an initial insurance payment to Lockheed. In addition, National Casualty did not raise this defense until almost six years after the vessel's accidents.

Finally, the Court notes that nothing in the record supports a finding that Lockheed failed to exercise due diligence, and the burden to prove such a defense is on National Casualty. *Saskatchewan*, 242 F.2d at 389. The records shows that Lockheed performed numerous tests on the ship prior to departure, measured the draft depth of the vessel after additional fuel had been loaded, obtained a weather forecast, made all necessary repairs to the vessel, and consulted with National Casualty's surveyor, Graessle. Indeed, Graessle approved the ship's voyage. From everything in the record, it appears that the ballasting problem that led to most of the damage on the ship was caused by the negligence of a crew member. Such negligence is covered by the Liner Negligence Clause.

For the above stated reasons, the Court finds that Lockheed exercised due diligence in sending the Slice to sea.

### C. One or Two Events

Lockheed seeks a ruling by the Court that the fuel contamination and the engine room flooding are one occurrence under the Policy and thus subject to one deductible. National Casualty argues that the fuel contamination and engine room flooding were caused by separate events and thus are two occurrences under the Policy. National Casualty maintains that the fuel contamination was caused by a faulty fuel cap and that the engine room flooding was caused by the Slice being over-ballasted. Lockheed replies that the over-ballasting of the boat caused water to come aboard, and that water caused both the fuel contamination and the engine room flooding.

The Court has reviewed the record and finds that this is an issue of causation that should be resolved by the jury. It would be inappropriate for the Court to determine whether the fuel contamination should be attributed to the fuel cap leak or the over-ballasting. There is evidence in the record to suggest that some water can be expected to come onto the deck of the Slice regardless of the ballasting issue. From the record, it is not clear to the Court whether the water that contaminated the fuel was water that would have come onto the ship regardless of the over-ballasting or was water that came onto the ship as a direct result of the over-ballasting. A jury is in a better position to decide this issue.

### D. Owner's Work and Tug Damage

When the Slice was being repaired, National Casualty's surveyor, Graessle, signed a final Field Survey that listed the repairs to the ship. (*See, e.g.*, Ex. 32 to Def's. Mot. Summ. J.) The final Field Survey listed repair items that were designated "Owner's work." Lockheed does not claim coverage for the Owner's work. National Casualty argues that the amount of Owner's work is actually greater than that listed on the final Field Survey. Lockheed argues that Graessle

15

was National Casualty's agent and thus National Causalty should be bound to Graessle's prior determinations and estopped from attributing more repair costs to Owner's work.

Graessle also attended a meeting at which damages were attributed to the tug accidents. Graessle agreed with Lockheed's surveyor regarding the amount to attribute to the tug incidents. (*See, e.g.*, Ex. 32 to Def's. Mot. Summ. J.)  Lockheed then relied on this allocation in reaching a settlement with the tug companies. National Casualty participated in that settlement on behalf of the tug companies. National Casualty now attempts to attribute more repair costs to the tug incidents. Lockheed asserts that National Casualty is bound by Graessle's participation in the previous allocation and by National Casualty's participation in the settlement, and thus Lockheed argues that National Casualty is estopped from attributing more repair costs to the tug accidents.

The Court agrees with Lockheed as relates to the tug accident damages but agrees with National Casualty as to the Owner's work attributions. In Maryland, the elements of estoppels are: (1) voluntary conduct or representation; (2) reliance; and (3) detriment. *Heartwood 88, Inc. v. Montgomery County*, 846 A.2d 1096, 1116 (Md. Ct. Spec. App. 2004).

Regarding the Owner's work attributions, the Court fails to see how Lockheed relied on those assertions to its detriment. Lockheed has not been harmed by Graessle's assertions on this issue, and thus estoppel does not apply. While the jury or fact finder will be able to review and consider evidence of the final field survey, the Court believes both Lockheed and National Casualty are free to litigate what was or was not Owner's work.

The costs associated with the tug accidents are different. National Casualty's agent helped allocate costs to the tug damages. Lockheed relied on these determinations in settling its claims with the tug companies. To allow National Casualty now to attribute more damages to the tug settlements would irreparably harm Lockheed, as Lockheed cannot now go back to the

tug owners for more damages. As such, the Court finds that National Casualty is stopped from attributing more repair costs to the tug accidents.

  **E.**  **Minimum Recovery**

In its First Amended Complaint, National Casualty seeks a declaration that "$718,945 represents the reasonable costs of repairs for the separate fuel contamination and flooding occurrences less applicable deductibles for each occurrence." Because of this statement, Lockheed seeks summary judgment finding that the minimum recovery to which Lockheed is entitled is $718,945 less applicable deductibles. National Casualty argues that this was an alternative pleading and not a binding judicial admission. National Casualty cites case law that shows that a "counsel's statement of his conception of the legal theory of the case" is not subject to the doctrine of judicial admissions. *See New Amsterdam Casualty Co. v. Waller*, 323 F.2d 20, 24 (4th Cir. 1963).

"Under Maryland law, party admissions in pleadings are considered to be substantive evidence of the facts admitted." *See MCIC, Inc. v. Zenobia*, 587 A.2d 531, 547 (Md. Ct. Spec. App. 1991), *rev'd in part on other grounds sub nom. Owens-Illinois, Inc. v. Zenobia*, 601 A.2d 633 (Md. 1992); *Beck v. Beck*, 684 A.2d 878, 882 (Md. Ct. Spec. App. 1996). However, this doctrine only applies to factual admissions. *New Amsterdam Casualty Co. v. Waller*, 323 F.2d at 24.

National Casualty has previously pled that, if there is coverage, the reasonable cost of repairs is $718,945 less deductibles. The Court has trouble viewing this prior assertion as anything other than an assertion of fact, not a legal theory. The reasonable cost of repairs is an issue that typically goes to a jury; juries determine issues of fact. As such, the Court finds that this is a binding judicial admission that shows that the minimum recovery is $718,945 less

deductibles. The fact that National Casualty pled the alternative theory that Lockheed's claim was barred by the statute of limitations (a claim that has already been dismissed by the Court) does not alter the Court's finding.

## IV. CONCLUSION

For the foregoing reasons, the Court will: (1) GRANT IN PART and DENY IN PART Plaintiff's Motion for Partial Summary Judgment; (2) GRANT IN PART and DENY IN PART Defendant's Cross Motion for Summary Judgment; and (3) GRANT Defendant's Motion for Leave to File Excess Pages Relating to Reply Memorandum. A separate Order will follow.

   September 8, 2009                                           /s/
         Date                                                 Alexander Williams, Jr.
                                                                     United States District Judge