# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND
# SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| NATIONAL CASUALTY COMPANY, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. AW-05-1992 |
| LOCKHEED MARTIN CORPORATION, | * | |
| Defendant. | * | |

## Memorandum Opinion

This longstanding action arises out of the alleged breach of a marine insurance policy between National Casualty Company (hereinafter "NCC"), the insurer, and Lockheed Martin (hereinafter "Lockheed"), the insured. After a multi-week trial, the jury returned a verdict in favor of Lockheed, *see* Doc. No. 252, and the Court entered final judgment soon thereafter, *see* Doc. No. 261. Two post-trial matters are currently before the Court: (1) NCC's motion for judgment notwithstanding the verdict (hereinafter "JNOV") or, in the alternative, to amend the judgment, Doc. No. 264, and (2) Lockheed's cross-motion to recover the attorney fees it incurred in responding to NCC's JNOV motion, Doc. No. 265.

Both motions turn on the proper interpretation of a hotly disputed provision of the insurance policy: General Condition 2(a) (hereinafter "GC 2(a)"). Lockheed's position is that GC 2(a) enables it to recover the attorney fees it incurred in vindicating its insurance claim against NCC. NCC counters that GC 2(a) does not authorize fee shifting under the circumstances of this case.

The Parties have briefed this issue early and often. It was first presented in NCC's motion for summary judgment, which the Court denied, siding with Lockheed's interpretation of GC 2(a). *See* Doc. No. 106. NCC moved for reconsideration on that issue, which the Court denied for essentially the same reasons. *See* Doc. No. 118. Prior to trial, NCC filed a motion *in limine* to exclude evidence pertaining to Lockheed's attorney fees. *See* Doc. No. 146. However, this motion was a *de facto* motion for reconsideration of the Court's summary-judgment rulings, dressed in the garb of an evidentiary motion. The Court denied it accordingly, but recognized that the interpretation of GC 2(a) presents a "complex and difficult" issue. Doc. No. 182 at 7. For this reason, the Court indicated that it "is open to the possibility of hearing the Parties' arguments for and against reconsideration during the trial (at the directed-verdict stage) and/or after (at the J.N.O.V. stage)." *Id.* at 8.

NCC accepted the Court's invitation by filing a JNOV motion, so GC 2(a) is now before the Court once again. The Court has carefully reviewed the Parties' filings on the currently pending motions, their memoranda submitted in connection with their motions for summary judgment and reconsideration, as well as the Court's own previous opinions regarding GC 2(a). After wrestling with this difficult contractual provision over the course of several years, the Court is now convinced that a subtle yet significant error has been made, and that the misstep is sufficiently serious that it demands correction. In order to ensure that "the case will ultimately be closed with correct answers to the challenging legal questions that have arisen in the course of five years of litigation," Doc. No. 246 at 7 (memorandum opinion interpreting the phrase "due diligence"), the Court must grant NCC's motion, deny Lockheed's motion, and modify the judgment accordingly.

## I. Standard of Review

NCC's motion seeks relief through either of two different procedural devices: JNOV, *see* Fed. R. Civ. P. 50(b), or amendment of judgment, *see* Fed. R. Civ. P. 59(e). The standard for JNOV is "precisely the same as the standard for granting the motion [for a directed verdict] prior to the submission to the jury." *Willis v. Youngblood*, 384 F. Supp. 2d 883, 886 (D. Md. 2005). Thus, a court should not "disturb a jury verdict 'unless, without weighing the evidence or assessing witness credibility, [it] conclude[s] that reasonable people could have returned a verdict' only for the moving party." *Randall v. Prince George's Cnty., Md.*, 302 F.3d 188, 201 (4th Cir. 2002) (quoting *Cooper v. Dyke*, 814 F.2d 941, 944 (4th Cir. 1987)).

The JNOV framework seems ill-suited to the procedural posture of this case. JNOV involves the same standard of review as a directed verdict, which in turn parallels summary-judgment review. However, at the summary-judgment stage in this litigation, the Court already ruled on the same set of issues NCC now raises in its JNOV motion. Thus, NCC's JNOV motion is functionally identical to a routine motion for reconsideration and attempts to benefit from the same relaxed standard of review that applies to such motions. *See* Fed. R. Civ. P. 54(b) ("[A]ny order or other decision, however designated, that adjudicates fewer than all the claims . . . does not end the action . . . and may be revised at any time before the entry of a judgment adjudicating all the claims . . . ."); *see also Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514-15 (4th Cir. 2003) (noting that motions for reconsideration of interlocutory orders are "not subject to the strict standards applicable to motions for reconsideration of a final judgment," but are instead "committed to the discretion of the district court").[1]

---

[1] NCC previously filed a motion for reconsideration on GC 2(a) pursuant to Rule 54, *see* Doc. No. 108, which the Court denied, *see* Doc. No. 118.

However, now that the jury has returned a verdict and judgment has been entered in favor of Lockheed, relief pursuant to Rule 54—or relief that looks suspiciously like relief under Rule 54, as does the JNOV portion of NCC's motion—is inappropriate. *See* Fed. R. Civ. P. 54(b) (permitting revision of court order "at any time *before the entry of a judgment adjudicating all the claims*" (emphasis added)). Reconsideration of the Court's prior decisions—including its summary-judgment-related decisions—is still available, but only if NCC can satisfy the more taxing standard of review provided by Rule 59.

Rule 59(e) is the appropriate device for litigants seeking reconsideration of a judgment where JNOV is inapplicable. "While the Rule itself provides no standard for when a district court may grant such a motion, courts interpreting Rule 59(e) have recognized three grounds for amending an earlier judgment: (1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." *Hutchinson v. Staton*, 994 F.2d 1076, 1081 (4th Cir. 1993). The relevant ground here is the third: "to correct a clear error of law or prevent manifest injustice." *Id.*[2]

## II. Analysis

The Court will begin by summarizing relevant Maryland law relating to the recoverability of attorney fees and contract interpretation. It will then provide background on GC 2(a) and the structure of the insurance policy. Finally, the Court will show that the language of GC 2(a) is

---

[2] Lockheed urges the Court not to reconsider its former decision on the basis of the law-of-the-case doctrine. This doctrine provides that "'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *United States v. Aramony*, 166 F.3d 655, 661 (4th Cir. 1999) (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988)). However, this rule admits of exceptions, and one of these exceptions—when a prior decision is "clearly erroneous and would work manifest injustice," *id.* (quotation and quotation marks omitted)— is identical to the third prong of the *Hutchinson* test for amending judgment pursuant to Rule 59(e), *see* 994 F.2d at 1081.

initially ambiguous, but will then explain how the ambiguity disappears when extrinsic evidence is consulted for guidance as to the meaning of the policy.

### A. Maryland Law on Recovery of Attorney Fees and Contract Interpretation

On the subject of attorney fees, "Maryland follows the common law 'American Rule,' which states that, generally, a prevailing party is not entitled to recover its attorney fees." *Nova Research, Inc. v. Penske Truck Leasing Co., L.P.*, 952 A.2d 275, 281 (Md. 2008). Courts make an exception where "the parties to a contract have an agreement to that effect" that authorizes recovery of attorney fees. *Thomas v. Gladstone*, 874 A.2d 434, 437 (Md. 2005). The Court must apply ordinary principles of contract interpretation to determine whether the agreement authorizes the recovery of attorney fees; however, the Court must also "'strictly construe[]'" fee provisions in order to "'avoid inferring duties that the parties did not intend to create.'" *Nova*, 952 A.2d at 287 (quoting Robert L. Rossi, *Attorneys' Fees* § 9:18 (3d ed. 2002, Cum. Supp. 2007)). "Where the contract provides no express provision for recovering attorney's fees in a first party action establishing the right to indemnity, . . . we decline to extend this exception to the American rule, which generally does not allow for prevailing parties to recover attorney's fees." *Id.* at 285.

Under Maryland law, insurance policies are "construed in the same manner as contracts generally." *Collier v. MD-Individual Practice Ass'n,* 607 A.2d 537, 539 (Md. 1992). As with all contracts, a court must attempt to "ascertain the intent of the parties from the words used." *Levy v. Am. Mut. Liab. Ins. Co.*, 73 A.2d 892, 894 (Md. 1995). In doing so, the instrument must be viewed as a whole, attributing to each word its plain meaning, unless there is "an indication that

5

the parties intended to use the words in a technical sense." *Sullins v. Allstate Ins. Co.,* 667 A.2d 617, 619 (Md. 1995).

If a court determines that the plain meaning of the contract is "clear and unambiguous," then "there is no room for construction, and it must be presumed that the parties meant what they expressed." *Bd. of Trustees of State Colls. v. Sherman*, 373 A.2d 626, 629 (Md. 1977). A contract is ambiguous if its language "suggests more than one meaning to a reasonably prudent layperson." *Sullins*, 667 A.2d at 619. If the language is ambiguous, a court may consult "extrinsic and parol evidence . . . to ascertain the intentions of the parties." *Id.* When consideration of extrinsic evidence removes the ambiguity, "it is the province of the court, rather than of the jury, to construe the contract." *Ebert v. Millers Mut. Fire Ins. Co.*, 155 A.2d 484, 488 (Md. 1959). Conversely, "if disputed factual issues are presented by the evidence bearing upon the ambiguity, construction of the contract is for the jury." *Truck Ins. Exch. v. Marks Rentals, Inc.*, 418 A.2d 1187, 1190 (Md. 1980).

### B. Background on GC 2(a) and the Insurance Policy

The insurance policy, *see* Doc. No. 266, Ex. 2 (hereinafter "Policy") between NCC and Lockheed draws much of its language from various form marine insurance policies, but it also contains manuscript provisions that were specifically customized by the drafter. Many provisions within the Policy insure Lockheed's vessels against damage, whereas others protect Lockheed against potential liability to third parties for harm caused by Lockheed's vessels. Thus, the Policy is a hybrid that rolls multiple types of insurance coverage—property protection and third-party-liability indemnification—into a single contract.

The structure of the Policy is comprised of three sections. Section I, entitled Hull & Machinery, contains both property insurance and liability protection. One of the property provisions of Section I—the Liner Negligence Clause, which requires NCC to pay Lockheed for the reasonable cost of repairs for damage to insured vessels (unless the damage resulted from a lack of due diligence on the part of Lockheed)—has been the focal point of this litigation. Section II, Protection & Indemnity, primarily provides indemnification for various types of liability to third parties, including injuries to crewmembers or passengers due to negligent handling of a vessel. Section III, Marine Liabilities, insures Lockheed against other potential third-party liabilities, including negligence as a charterer of a vessel or as a dock operator.

The Policy begins with a brief summary of the coverage provided in the three Sections, followed by twenty-seven "GENERAL CONDITIONS (AS RESPECTS ALL SECTIONS)." *Id.* at 3. Section I—which, again, contains the provision that forms the basis for liability in this case—indicates that the General Conditions "shall apply to all vessels insured under this Section I and shall prevail if inconsistent with the following conditions." *Id.* at 12. The clause within the General Conditions that is implicated in NCC's motion to amend the judgment is GC 2(a), which reads as follows:

> 2. Costs and Expenses:
>
> This policy also covers --
>
> (a) Costs, charges and expenses reasonably incurred by the Assured in defense and/or investigation of any claim coming within the scope of this policy, subject to the agreed deductibles applicable, and subject to the conditions and limitation hereinafter provided.

**C. The Language of GC 2(a) is Ambiguous**

7

Lockheed's argument that GC 2(a) unambiguously authorizes fee shifting is simple, elegant, and initially seems quite plausible. Here is a concise summary of Lockheed's position, with a few adjustments to state the argument in its strongest form:

> NCC filed this action against Lockheed seeking a declaratory judgment that Lockheed does not have a valid claim under the Policy. Consequently, Lockheed is the nominal Defendant, and the costs incurred during this litigation are unambiguously "expenses reasonably incurred . . . in defense . . . of [a] claim" within the meaning of GC 2(a). The costs of litigation include attorney fees; therefore, such fees are unambiguously "[c]osts, charges and expenses" under GC 2(a). Furthermore, because Lockheed's underlying insurance claim against NCC is a claim under Section I, which is (obviously) a part of the Policy, there can be no doubt that the claim Lockheed is defending in this litigation is a "claim coming within the scope of this policy." The Court should therefore find GC 2(a) unambiguous and disregard the extrinsic evidence identified by NCC that purports to show that language akin to GC 2(a) ("defense and/or investigation of [a] claim") is never seen in property-insurance policies, but only in third-party-liability policies.

The Court's memorandum opinion denying summary judgment to NCC on the interpretation of GC 2(a) relies on a substantially similar line of reasoning. The Court held that the applicability of GC 2(a) "is unambiguous" because its language extends broadly "to 'any claim[] coming within the scope of this policy,'" and Lockheed's property claim against NCC is based on the Policy and is therefore "a claim 'within the scope of this policy.'" Doc. No. 106 at 8. Given the Court's holding that GC 2(a)'s language was unambiguous, it properly declined to consider the form insurance policies and other extrinsic evidence presented by the Parties.

Despite the initial elegance of Lockheed's position, however, its allure fades upon sustained analysis. Several important ambiguities emerge that demand the sort of clarification that extrinsic evidence can supply. To begin with, even if it were unambiguous that some types of costs and expenses incurred by Lockheed were covered by GC 2(a), Maryland law holds attorney-fee-shifting provisions to a much higher level of scrutiny. The Court must "strictly construe[]" fee-shifting clauses and only authorize the recovery of attorney fees when "express provision" is made for them. *Nova*, 952 A.2d at 285, 287 (quotation and quotation marks omitted).

Lockheed is correct that Maryland courts do not require fee-shifting clauses to use the magic words "attorney fees," and that the phrase "costs, charges, and expenses" can, in some circumstances, authorize recovery of attorney fees. *See, e.g.*, see *Atl. Contracting & Material Co. v. Ulico Cas. Co.*, 844 A.2d 460, 469, 478 (Md. 2004) (granting attorney fees pursuant to a contract providing indemnification of "damages, costs, charges, and expenses of any kind" incurred "in connection with . . . the enforcement of this Agreement"). Furthermore, the Court agrees that pairing the phrase "[c]osts, charges, and expenses" with the phrase "defense . . . of [a] claim" strongly suggests that fee-shifting is appropriate for *some types of defenses of some types of claims*.

However, the crucial ambiguity in GC 2(a) emerges precisely in defining what sort of "defense" of what sort of "claim" allows for fee shifting. If the Policy were a pure third-party-liability contract and Lockheed were sued by a third party for damages covered by the policy, Lockheed's defense would undoubtedly be a "defense . . . of [a] claim within the scope of the policy." However, in this case, Lockheed is defending a declaratory-judgment action in which it has filed a Counter-Claim covering the exact same topics as NCC's declaratory-judgment Complaint. Lockheed is therefore a nominal Defendant, as it fully recognized when it filed a motion requesting realignment of the Parties such that it would be the Plaintiff and NCC the Defendant. *See* Doc. No. 130 at 1 (referring to NCC as the "nominal plaintiff").[3]

It is not the Court's task to stretch the meaning of "defense . . . of [a] claim" to encompass factually dubious scenarios such as this. On the contrary, the Court must "strictly construe[]" the fee-shifting potential of GC 2(a) so as to only permit recovery if it is absolutely

---

[3] The Court ultimately denied Lockheed's motion because it deemed realignment to be unnecessary. *See* Doc. No. 137. The Court did not, however, disagree with Lockheed's obviously correct argument that it is the real plaintiff-in-interest in this litigation.

9

clear that such was intended by the Parties. *Nova*, 952 A.2d at 285, 287 (quotation and quotation marks omitted).

These considerations bring the Court fairly close to the point of holding that GC 2(a) unambiguously does *not* authorize fee shifting in the circumstances presented here, *i.e.* the situation where an insured is the nominal defendant, but *de facto* plaintiff, pursuing a property claim against its insurer. However, the force of Lockheed's counter-argument gives sufficient pause to hold, instead, that the language of GC 2(a) is merely ambiguous. When the Court restricts its inquiry to the language and structure of the Policy, the following facts leave the Court with unanswered questions: the breadth of the phrase "any claim coming within the scope of this policy"; Lockheed's technical status as the named Defendant in this action; and the fact that there is a meaningful colloquial sense in which Lockheed can be described as defending its insurance claim.[4] Thus, the Court now reaches the question that it did not examine in its prior memorandum opinions: whether extrinsic clarifies the ambiguity of GC 2(a).

### D. Extrinsic Evidence Renders GC 2(a) Unambiguous

The extrinsic evidence bearing upon the meaning of GC 2(a) falls into three general categories. First, the Parties highlight expert testimony on the topics of whether GC 2(a) (or the Policy more generally) authorizes Lockheed to recover its attorney fees. Second, the Parties discuss actions by each other's agents that arguably amount to admissions as to the recoverability (or non-recoverability) of Lockheed's fees. The Court has reviewed these categories of extrinsic evidence and finds them inconclusive and unhelpful. The Court will therefore focus its attention

---

[4] For instance, the second definition of "defend" in Webster's II New Riverside University Dictionary (hereinafter "Webster's II") captures a common use that would not restrict the word to the reactive connotations that it bears in the litigation context: "To support or maintain, as by argument or action." *Webster's II* at 355 (3d ed. 1994).

on the remaining category of extrinsic evidence, which turns out to be highly illuminating: comparable language from other insurance policies that reveals a clear industry convention regarding the function and meaning of provisions such as GC 2(a).

The evidence identified by NCC overwhelmingly establishes that language strikingly similar to that found in GC 2(a) is commonplace in third-party-liability policies, but is never found in policies that only provide property-insurance coverage. To begin with, Section I of the Policy (unlike the third-party-liability provisions in Sections II and III) contains no language comparable to GC 2(a), nor do the two hull form policies—the American Institute Tug Form and the American Institute Hull Clauses—that Lockheed and NCC incorporated into Section I. *See* Policy § I; Policy, American Institute Hull Clauses; Policy, American Institute Tug Form. NCC's memorandum in support of summary judgment goes on to reference eight other hull policy forms,[5] as well as three non-marine property coverage forms,[6] none of which include provisions resembling GC 2(a). NCC also references four marine forms that include both property and third-party-liability coverage (like the Policy in this case), all of which provide coverage for costs and expenses incurred in defending against liabilities covered by the policy, but none of which cover the costs of "defending" a property claim.[7]

---

[5] *See* Doc. No. 83, Ex. K (American Institute Coastwise and Inland Hull Clauses (November 2, 1972) Form 27); Doc. No. 83, Ex. L (Taylor 1953 (Rev. 70) Form SP-39C); Doc. No. 83, Ex. M (Pacific Coast Tug/Barge Form (1979)); Doc. No. 83, Ex. N (Barge Hull Form 1955 (McLelland 2138)); Doc. No. 83, Ex. O (American Institute Port Risk Form (December 1955)); Doc. No. 83, Ex. P (AHAB Form (Revised July 1, 1962) SP-33A); Doc. No. 83, Ex. Q (American Institute Lake Time Clauses Hulls (March 1, 1973) Form 47V-12); Doc. No. 83, Ex. R (Drydock Form 107).

[6] *See* Doc. No. 83, Ex. S (Commercial Inland Marine Conditions, ISO Form CM 0001); Doc. No. 83, Ex. T (Commercial Fine Arts Coverage Form, ISO Form CM 0042); Doc. No. 83, Ex. U (Building and Personal Property Coverage Form, ISO Form CP 0010).

[7] *See* Doc. No. 83, Ex. V (American Institute Builder's Risks Clauses (February 8, 1979) Form 13-L); Doc. No. 83, Ex. W (American Institute Ship Repairers Liability Clauses (November 3, 1977)); Doc. No. 83, Ex. Y (Charterer's Legal Liability Rider (Annual Basis) Form SP-43A (May 1960), Doc. No. 83, Ex. X; Trawler All Risk Clauses Form SP-45).

11

Conversely, third-party-liability policies routinely contain provisions akin to GC 2(a). In fact, Section III of the Policy ("Marine Liabilities") includes language virtually identical to GC 2(a), including the phrase that is so crucial to Lockheed's argument: "claims coming within the scope of the policy." Policy at 16. Form SP-23, which is incorporated in Section II of the Policy, similarly covers "[c]osts, charges, and expenses, reasonably incurred and paid by the Assured in defense against any liabilities insured against hereunder." Policy, Form SP-23 cl. 14. Along the same lines, NCC documents three other marine liability forms,[8] as well as four non-marine liability forms,[9] that include language bearing a striking resemblance to GC 2(a). NCC has also found eight cases dealing with liability policies containing language parallel to GC 2(a).[10]

Lockheed has not brought to the Court's attention even a single counter-example, *i.e.* a property-insurance policy with fee-shifting language comparable to that of GC 2(a). Lockheed rests its entire case on the fact that the Policy is a manuscript policy, not a form policy. In essence, Lockheed argues that the Court should shut its eyes to industry conventions and look exclusively to the language found in GC 2(a). Yet, given the ambiguity of the language itself, and the uniformity with which that language is used in other insurance policies, the Court is unconvinced by Lockheed's rejoinder. Accordingly, the Court finds that its previous decision

---

[8] *See* Doc. No. 83, Ex. D (SP-38 Protection and Indemnity Clauses (1955)); Doc. No. 83, Ex. E (AIMU Protection and Indemnity (P and I) Clauses (June 2, 1982)); Doc. No. 83, Ex. F (Protection and Indemnity Clauses (Great Lakes) (April, 1962) Form 60A-74).

[9] *See* Doc. No. 83, Ex. G (ISO Commercial General Liability Coverage Form, CG 0001); Doc. No. 83, Ex. H (Electronic Data Liability Coverage Form, ISO Form CG 0065, § I, Supplementary Payments ¶ 3); Doc. No. 83, Ex. I (Pollution Liability Form Designated Sites, ISO Form CG 0039, § I, Supplementary Payments ¶ 2); Doc. No. 83, Ex. J (Commercial Liability Umbrella Coverage Form, ISO Form CU 0001, Supplementary Payments − Coverages A and B, ¶ 1.d).

[10] Three representative examples are: *WDC Venture v. Hartford Accident & Indem. Co.*, 938 F. Supp. 671, 675 (D. Haw. 1996) (discussing a general liability policy that covers "[l]oss and legal expenses incurred by the insured with the consent of the company in the investigation or defense of claims"); *IBP, Inc. v Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 299 F. Supp. 2d 1024, 1030 (D. S.D. 2003) (involving a liability policy for directors, officers and the corporation that covers "fees, costs, and expenses . . . resulting solely from the investigation, adjustment, defense and appeal of a claim against the Insured"); *Westchester Specialty Ins. Servs. v. U.S. Fire Ins. Co.*, 119 F.3d 1505, 1508 (11th Cir. 1997) (discussing products liability policy that obligates policyholder to provide "defense and investigation of any claim" within limit of self-insured retention).

regarding the construction of GC 2(a) was a clear error of law, and the Court now holds that Lockheed is not entitled to recover the attorney fees that it incurred during the course of this litigation.

**III.    Conclusion**

For the reasons stated above, NCC's motion will be granted, and Lockheed's will be denied. A separate order will follow.

  July 28, 2011              /s/          
      Date                                                         Alexander Williams, Jr.
                                                                   United States District Judge